**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 353-0404

**THE LAW OFFICE OF PAUL K. JOSEPH, PC**
PAUL K. JOSEPH (SBN 287057)
*paul@pauljosephlaw.com*
3150 Cabrillo Bay Ln.
San Diego, California 92110
Phone: (619) 767-0356
Fax: (619) 331-2943

***Counsel for Plaintiff***

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON ZAJONC, DANYAEL WILLIAMS, and PRANKO LOZANO, on behalf of themselves, all others similarly situated, and the general public,<br><br>  Plaintiffs,<br><br>  v.<br><br>ELECTRONIC ARTS INC.,<br><br>  Defendant. | Case No.: 20-cv-7871<br><br>CLASS ACTION<br><br>**COMPLAINT FOR CONSUMER FRAUD AND UNJUST ENRICHMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendant Electronic Arts, Inc. ("EA"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## **INTRODUCTION**

1.     Since 1991, EA has developed and released annually a variety of sports simulation video games under its EA Sports label, available on a wide variety of gaming platforms. Modern versions, including those sold during the four years preceding the filing of this Complaint, include an option for online gaming.

2.     This Complaint concerns EA's practices with respect to the 2017 to 2021 versions of three EA Sports franchises: Madden NFL, FIFA, and NHL. This includes, specifically, Madden NFL 17, Madden NFL 18, Madden NFL 19, Madden NFL 20, and Madden NFL 21 (the "Madden Games"); FIFA17, FIFA18, FIFA19, FIFA20, FIFA21 (the "FIFA Games"); and NHL17, NHL18, NHL19, NHL20, and NHL21 (the "NHL Games"). Collectively, the Madden Games, FIFA Games, and NHL Games are referred to herein as the "EA Sports Games."

 

3.     The EA Sports Games are some of the best-selling video game franchises in the world. For example, FIFA sold more than 282 million copies as of 2019. Today, over 33

---

1

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT

million gamers,[1] in more than 50 countries play FIFA, with 5 million residing in the United States. Similarly, as of October 2020, there are approximately 8 million Madden NFL 20 gamers in the United States on the PlayStation 4 platform alone, and approximately 2.5 million NHL gamers in the United States across the Xbox and PlayStation gaming platforms.

4.     The most popular gameplay mode for the all of the EA Sports Games is called Ultimate Team Mode (often colloquially abbreviated as "UT" with a modifying letter for the corresponding game, i.e., "MUT" for Madden Ultimate Team, "FUT" for FIFA Ultimate Team, or "HUT" for Hockey Ultimate Team). Ultimate Team modes allow gamers to build and customize an "Ultimate Team" for online matches.

5.     During the preceding four years, EA made, and continues today to make available for sale to Ultimate Team gamers in-game "loot boxes," called "Player Packs," which gamers redeem to receive randomized "Player Cards," representing players with varying skill, summarized in a player rating.

6.     Once a gamer purchases a Player Pack and unlocks a Player Card, the gamer can use the unlocked player on his or her Ultimate Team. Loot boxes are games of chance, and gamers who purchase Player Packs hope to get lucky and receive highly-rated players for use on their Ultimate Teams, so as to be more competitive in Ultimate Team Mode matches.

7.     Unbeknownst to most gamers, however, without disclosing it, EA utilizes one or more artificial intelligence technologies that adjust game difficulty dynamically, such as Dynamic Difficulty Adjustment ("DDA") and Adaptive Difficulty ("Difficulty Adjusting Mechanisms"). At least some of these technologies use heuristic prediction and intervention to adaptively change the difficulty of matches, and influence or even dictate the outcomes, thereby keeping gamers more engaged.

8.     EA uses Difficulty Adjusting Mechanisms because there is a direct correlation between heightened gamer engagement and in-game spending. But purchasers of EA Sports

---

[1] For clarity, this Complaint uses the term "gamers" to refer to the real-life persons who engage in video game play, and "players" to refer to the virtual players making up a gamer's football, soccer, or hockey team within an EA Sports Game.

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT

Games and Player Packs are injured by EA's undisclosed use of Difficulty Adjusting Mechanisms.

9.     First, EA's undisclosed use of Difficulty Adjusting Mechanisms deprives gamers who purchase Player Packs of the benefit of their bargains because EA's Difficulty Adjusting Mechanisms, rather than only the stated ranking of the gamers' Ultimate Team players and the gamers' relative skill, dictates, or at least highly influences the outcome of the match. This is a self-perpetuating cycle that benefits EA to the detriment of EA Sports gamers, since Difficulty Adjusting Mechanisms make gamers believe their teams are less skilled than they actually are, leading them to purchase additional Player Packs in hopes of receiving better players and being more competitive.

10.     Second, EA's undisclosed use of Difficulty Adjusting Mechanisms injured all purchasers of the EA Sports Games, regardless of whether they also purchased Player Packs, because an EA Sports game that uses Difficulty Adjusting Mechanisms to determine the outcome of gameplay is worth less than one that does not.

11.     Plaintiffs bring this action against EA on behalf of themselves, other similar-situated consumers, and the general public, to recover compensation for their injuries, and to enjoin EA's wrongful acts.

## THE PARTIES

12.     Plaintiff Jason Zajonc is a resident of Sonoma County, California.

13.     Plaintiff Danyael Williams is a resident of Sonoma County, California.

14.     Plaintiff Pranko Lozano is a resident of San Diego County, California.

15.     Defendant Electronic Arts, Inc. is a Delaware corporation with its principal place of business at 209 Redwood Shores Parkway, Redwood City, California, 94065.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from EA. In addition, more than two-thirds

of the members of the class reside in states other than the state in which EA is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

17.     The Court has personal jurisdiction over EA because EA is headquartered in California. The Court also has jurisdiction pursuant to Cal. Code Civ. P. § 410.10, as a result of EA's substantial, continuous and systematic contacts with the State, and because EA has purposely availed itself of the benefits and privileges of conducting business activities within the State.

18.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c), because EA resides (*i.e.*, is subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

19.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to either the San Francisco or Oakland division because a substantial part of the events and omissions which give rise to the claim occurred in San Mateo and Sonoma Counties.

## FACTS

### I.     EA SPORTS GAMES & THEIR ULTIMATE TEAM MODES

20.     Most popular real-life sports have been turned into simulation-based video games. American football, soccer, and hockey are no exceptions. EA produces, markets, and sells the EA Sports Games as simulation video games.

21.     On its website, EA describes FIFA as having "UNRIVALED AUTHENTICITY," with the "most authentic ever representation of the league;" its Madden NFL games as "hyper-realistic" and as "delivering you gameplay control with precision and intent;" and its NHL games as "look[ing] and feel[ing] truly authentic."

22.     Gamers can only compete against other gamers playing the same EA Sports Game iteration. For example, a gamer playing NHL19 can only play against another gamer

4

playing NHL19. This helps EA incentivize gamers to purchase the newest iteration of the EA Sports Games each year.

23.    Starting with its 2017 EA Sports Games, EA developed each annual iteration using a video game engine called Frostbite V.3, which is exclusive and proprietary to EA.

24.    To effectuate the simulation aspect of the EA Sports Games, each in-game player is based on a real-life counterpart. Real-life professional sports players have their likeness rendered in the video game for gamers to control on the virtual field. Each annual iteration updates the players available (mirroring active real-world players), their skill and attribute levels, and some graphical aspects. Some new versions also include tweaks to game play, which are typically minor.

25.    In their basic, traditional gameplay modes, the EA Sports Games allow gamers to select a team and play against either a computer-controlled opponent, or a live opponent, online.

26.    However, the EA Sports Games also include a far more popular game mode called Ultimate Team Mode, in which a gamer builds a team from scratch that does not necessarily correspond to the real-life roster of any actual team, but is instead a collection of real life players from across a variety of teams that the gamer collects.

27.    To make the EA Sports gameplay simulation realistic, each year EA assigns an overall rating to each virtual player's skills and abilities, on a 99-point scale, with scores typically correlated to the actual corresponding real-life player's skills.

28.    In addition to an overall rating, players are assigned ratings for specific skills and attributes like speed, strength, and agility, with higher-rated players performing those skills better than lower-rated players. For example, a player who is fast in real life will also be fast in the EA Sports Games. Thus, as a general rule, the best players in real life are also the best players in the EA Sports Games.

29.    Depicted below is a FIFA20 Player Card for star soccer player Lionel Messi.

5

## II.    LOOT BOXES IN EA SPORTS GAMES

30.    For approximately the last decade, so-called "loot boxes" have become increasingly popular in video games. Loot boxes are consumable virtual items, purchased in-game with real money, that can be redeemed to receive a randomized further virtual item—the loot—ranging from customization options for a gamer's avatar or character, to game-changing equipment or items.

31.    Items that can be obtained from loot boxes are unknown when purchased, and typically graded by "rarity," with the probability of receiving an item decreasing rapidly as rarity increases. Because of this, probabilities dictate that gamers must spend significant sums to obtain the best items, and loot boxes have been criticized as promoting addictive behaviors similar to gambling.

32.    Loot boxes keep gamers engaged by providing a source of new content and cosmetics, helping video game manufacturers like EA generate ongoing revenue through in-game spending, while avoiding drawbacks associated with paid downloadable content or game subscriptions. Earlier this year, EA disclosed that it had generated nearly $1 billion in revenue from in-game "microtransactions," including loot box sales, in the quarter ending December 31, 2019 *alone*.

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT

33.     Loot boxes have long been a feature of EA Sports Games Ultimate Team Modes, where the general goal is to assemble a team of the highest-rated players at each position. Gamers new to Ultimate Team Mode typically have teams comprised of low-rated players; to be competitive, they must spend time—and often real-word money—to obtain better players.

34.     In the EA Sports Games, loot boxes are known as Player Packs, and provide gamers who purchase them with a randomized Player Card, representing an in-game player who may then be used on the gamer's Ultimate Team, or sold on an open in-game market. The in-game markets use a virtual currency that can only be used to purchase other Player Cards in auction-style sales, or further Player Packs containing random Player Cards.

35.     The most highly-rated players, typically with ratings in the mid- or high-90s, are exceedingly rare. Because the best players have a lower chance of appearing in any given Player Pack, gamers must typically "pull" many Player Packs—that is, purchase many loot boxes—before obtaining a desired, or highly-rated player.

36.     To get the best in-game players, gamers must typically spend substantial amounts of real-world money to buy many Player Packs. It has been estimated that at the 2019 FIFA Ultimate Team Champions Cup, professional gamers were using Ultimate Teams with an average real-world value of approximately $27,000.

## III.   EA SPORTS ULTIMATE TEAM MODES USE DIFFICULTY ADJUSTING MECHANISMS, INJURING GAMERS

### A.     Difficulty Adjusting Mechanisms

37.     Without disclosing it, and unbeknownst to most gamers, EA uses in its EA Sports Games a patented artificial intelligence ("AI") technology called Dynamic Difficulty Adjustment, or DDA, which, as described in its patent,[2] "review[s] historical user activity data . . . to generate a game retention prediction model that predicts . . . an expected duration

---

[2] Available at https://patents.google.com/patent/US20170259177A1/en.

of game play," and then "perform[s] automatic granular difficulty adjustments," that are "undetectable by a user," to increase gameplay duration.

38.     The DDA patent explains its purpose as follows:

Software developers typically desire for their software to engage users for as long as possible. The longer a user is engaged with the software, the more likely that the software will be successful. The relationship between the length of engagement of the user and the success of the software is particularly true with respect to video games. The longer a user plays a particular video game, the more likely that the user enjoys the game and thus, the more likely the user will continue to play the game.

Often, games that are too difficult or too easy will result in less enjoyment for a user. Consequently, the user is likely to play the game less. Thus, one of the challenges of game development is to design a game with a difficulty level that is most likely to keep a user engaged for a longer period of time.

39.     The patent further explains:

[I]t may be desirable to maintain or increase a user's level of engagement with the video game. One solution . . . includes setting or adjusting a difficulty level of the video game based at least in part on a user's skill and a user's desired level of challenge when playing the video game. The interactive computing system can determine a level of difficulty for the video game for a particular user and can modify the difficulty of the video game based on the determination.

40.     Even where DDA is not specifically utilized, the EA Sports Games implement other difficulty adjusting mechanisms, including Adaptive Difficulty. Adaptive Difficulty alters game states in direct reaction to a gamer's perceived level of competence so as to moderate the degree of difficulty that the video game's challenges pose. Generally, this mechanism includes automatically changing parameters, scenarios, and behaviors in a video game in real-time, based on the gamer's ability, in order to avoid making the gamer bored (if an EA Sports Game match is too easy) or frustrated (if it is too hard). However, this has the effect of "scripting" an outcome by letting AI players—those controlled by the video game system rather than by the gamer—break the rules to which players controlled by gamers are bound, effectively allowing the AI to "cheat." For example, AI players might be given

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT

unlimited speed to catch up to and stay near the speed of a gamer-controlled player far ahead. This also works the other way, and does so in online matches even against other human gamers, by "cheating" the gamer-controlled players into missing passes or shots, running more slowly, or ceding possession of the ball or puck to the opponent.

**B.      Gamers who Purchase the EA Sports Games Do Not Receive the Benefit of their Bargain**

41.      Simulation games purport to focus on realism, as opposed to an "arcade style" of video game play, which is generally more unrealistic and emphasizes quicker and often cartoonish movement. Sports simulation gamers want as much realism as possible in their games. Purchasers expect sports simulation games to copy real-life as much as reasonably possible, and expect that the outcome of matches (either against a live opponent or an AI team) will accurately reflect a real-world outcome. And EA promises to deliver to gamers an authentic simulation experience.[3]

42.      Sports simulation gamers do not expect gameplay in which the outcome of a match is scripted, or even influenced by, undisclosed Difficulty Adjusting Mechanisms that alter game states and outcomes in reaction to the gamer's perceived level of engagement or competence.

43.      When gamers purchase a sports simulation game that utilizes an undisclosed Difficulty Adjusting Mechanism affecting the gameplay, and especially the outcome of matches, they have not received the benefit of what they bargained for—a simulation game that mirrors the real-world as much as reasonably possible, that is, one where the outcome of matches depends solely on the gamer's competence and the strength of the players on his or her team, as compared to his or her opponent's competence and team strength.

---

[3] *See*, *e.g.*, https://ir.ea.com/press-releases/press-release-details/2020/Electronic-Arts-the-NFL-and-the-NFLPA-Announce-a-Groundbreaking-Multi-Year-Global-Partnership/default.aspx ("Madden NFL franchise will exclusively create ***authentic football simulation*** games"); https://www.ea.com/games/fifa/fifa-20/news/fifa-20-all-leagues-and-clubs ("EA SPORTS™ brings you ***unrivalled authenticity*** in FIFA 20").

**C.     Gamers Who Purchase Player Packs are Injured by EA's Undisclosed Use of DDA in Ultimate Team Modes**

44.     Like all EA Sports Game gamers, Ultimate Team Mode gamers reasonably expect that the outcome of an Ultimate Team Mode match will depend on the relative strength of the gamer's team compared to his or her opponent's team, and the relative skill of those gamers themselves, in executing the various gameplay facets of the game.

45.     When gamers purchase Player Packs, they reasonably expect that the Player Cards they obtain will accurately reflect the virtual players' in-game abilities. For example, if a gamer receives a 90-rated player, he or she expects the in-game performance of that player to reflect the 90 rating.

46.     However, by adjusting the difficulty of Ultimate Team Mode matches "on the fly," EA's use of Difficulty Adjusting Mechanisms effectively makes the 90-rated player at least sometimes perform as though he were a lower-rated player, decreasing the relative importance of the ratings of a gamer's Ultimate Team players on the outcome of the match. As a result, persons who purchased Player Packs did not and do not receive the full benefit of their bargain.

47.     Moreover, as a result of Difficulty Adjusting Mechanisms, gamers were, and continue to be manipulated into purchasing more Player Packs than they otherwise would have, chasing higher-rated players based on a false perception about the relative strength of their teams, and a false belief that having higher-rated players will materially increase their chances of winning Ultimate Team Mode matches.

48.     EA is under a duty to disclose its use of Difficulty Adjusting Mechanisms because it has exclusive knowledge of material facts not known or reasonably accessible to Plaintiffs and other Class Members; has actively concealed material facts from Plaintiffs and other Class Members by publicly denying its use of DDA and other Difficulty Adjusting Mechanisms on multiple occasions; and has made partial misrepresentations that are misleading because EA's use of Difficulty Adjusting Mechanisms has not been disclosed, including the in-game player ratings as set forth on Player Cards.

## **PLAINTIFF'S RELIANCE & INJURY**

49.    In 2017, Plaintiff Jason Zajonc purchased from Gamestop EA Madden NFL 18 for Microsoft Xbox. Mr. Zajonc regularly played various game modes, including Madden Ultimate Team Mode. Until recently, Mr. Zajonc was unaware that EA implemented Difficulty Adjusting Mechanisms in any of the Madden NFL Games, including Madden NFL 18.

50.    When he bought Madden NFL 18, Mr. Zajonc was seeking and expecting a realistic sports simulation game in which the outcome of matches depended on his relative skill as a video gamer, and the relative strength of the player on their teams, when compared to match opponents. When he purchased Madden NFL 18, Mr. Zajonc was unaware EA used Difficulty Adjusting Mechanisms, including but not limited to DDA or Adaptive Difficulty, in any mode, including Ultimate Team Mode, to adjust the difficulty of matches and make them more competitive regardless of the players on each team involved in the match. If Mr. Zajonc had known EA used Difficulty Adjusting Mechanisms as alleged herein, he would not have purchased Madden NFL 18, or at least would not have been willing to pay as much as he did for the game.

51.    Between 2016 and 2018, Plaintiff Danyael Williams purchased from Gamestop EA Madden NFL 17 and 19 for Microsoft Xbox, for her minor son to play. Ms. Williams' son, until recently, regularly played various single-player modes for Madden NFL 17 and 19. Ms. Williams no longer allows her son to play any of the Madden NFL Games, at least in part due to addictive gameplay. Until recently, Ms. Williams was unaware that EA implemented Difficulty Adjusting Mechanisms in any of the Madden NFL Games, including Madden NFL 17 and 19.

52.    When she bought Madden NFL 17 and 19 for her son, Ms. Williams was seeking and expecting a realistic sports simulation game in which the outcome of matches depended on his relative skill as a video gamer, and the relative strength of the player on their teams, when compared to match opponents. When she purchased Madden NFL 17 and 19, Ms. Williams was unaware EA used Difficulty Adjusting Mechanisms, including but not limited

to DDA or Adaptive Difficulty, in any mode, including Ultimate Team Mode, to adjust the difficulty of matches and make them more competitive regardless of the players on each team involved in the match, and to keep players, including her son, more engaged. If Ms. Williams had known EA used Difficulty Adjusting Mechanisms as alleged herein, she would not have purchased Madden NFL 17 or 19, or at least would not have been willing to pay as much as she did for the game.

53. Between 2016 and 2020, Plaintiff Pranko Lozano purchased from the online PlayStation Store EA FIFA 17, 18, 19, 20, and 21 for the PlayStation 4. Mr. Lozano regularly played various FIFA game modes, including FIFA Ultimate Team Mode. Mr. Lozano also, from time to time, purchased FIFA Player Packs. Until recently, Mr. Lozano was unaware that EA implemented Difficulty Adjusting Mechanisms in the any of the FIFA games.

54. When he bought FIFA 17, 18, 19, 20, and 21, Mr. Lozano was seeking and expecting a realistic sports simulation game in which the outcome of matches depended on his relative skill as a video gamer, and the relative strength of the player on their teams, when compared to match opponents. When he purchased FIFA Player Packs, Mr. Lozano believed the ratings set forth on the Player Cards he received would accurately reflect the corresponding players' relatively in-game strength and skills. When he purchased FIFA 17, 18, 19, 20, and 21, and FIFA Player Packs, Mr. Lozano was unaware EA used Difficulty Adjusting Mechanisms, including but not limited to DDA or Adaptive Difficulty, in any mode, including Ultimate Team Mode, to adjust the difficulty of matches and make them more competitive regardless of the players on each team involved in the match, and to induce increased in-game spending, including on Player Packs. If Mr. Lozano had known EA used Difficulty Adjusting Mechanisms as alleged herein, he would not have purchased FIFA 17, 18, 19, 20, or 21, and would not have purchased as many FIFA Player Packs, if any, or at least would not have been willing to pay as much as he did for the FIFA games and Player Packs.

55. EA's failure to disclose its use of Difficulty Adjusting Mechanisms artificially inflated the price of the EA Sports Games and their in-game Player Packs, which Plaintiffs

and other Class Members would not have purchased at the prices they did, or at all, had they known the true facts.

56. If EA were enjoined from deceptively omitting its use of Difficulty Adjusting Mechanisms in the EA Sports Games, the market demand and price for the EA Sports Games and their in-game Player Packs would drop, as they have been artificially and fraudulently inflated due to EA's deceptive omissions.

57. Plaintiffs and other Class Members lost money as a result of EA's deceptive and unfair practices described herein, in that they did not receive what they paid for when purchasing either the EA Sports Games or the Player Packs.

58. Plaintiffs have long enjoyed EA Sports Games and the Ultimate Team Mode. If they could be assured through prospective injunctive relief that EA must discontinue or disclose any use of Difficulty Adjusting Mechanisms, they would likely purchase EA Sports Games and in-game Player Packs in the future. Absent prospective injunctive relief, especially because part of the functionality of Difficulty Adjusting Mechanisms is to remain hidden and because EA has historically failed to disclose and affirmatively denied their use in the EA Sports Games, it will be impossible for Plaintiffs to determine whether future versions of the EA Sports Games make use of Difficulty Adjusting Mechanisms.

## CLASS ACTION ALLEGATIONS

59. Pursuant to Fed. R. Civ. P. 23, Plaintiffs seek to represent a Class of all persons in the United States who, on or after November 9, 2016 purchased any of the EA Sports Games identified herein, and a Subclass of all persons in the United States who, on or after November 9, 2016, purchased any Player Pack or Player Card for one of the EA Sports Games.

60. Plaintiffs nevertheless reserve the right to divide into additional or different subclasses, expand, narrow, more precisely define, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

61.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

62.     Questions of law and fact common to Plaintiffs and the class (Fed. R. Civ. P. 23(a)(2) include, without limitation:

a.     Whether EA uses DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms (such as scripting, handicapping, or momentum) in its EA Sports Games;

b.     Whether EA uses DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in its EA Sports Games Ultimate Team modes;

c.     Whether and how EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in the EA Sports Games affects the outcome of any game mode matches;

d.     Whether and how EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in EA Sports Games Ultimate Team Mode affects the outcome of Ultimate Team Mode matches;

e.     Whether EA was required to disclose its use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in the EA Sports Games;

f.     Whether EA deceptively failed to disclose its use of DDA, Adaptive Difficulty or any other Difficulty Adjusting Mechanisms in the EA Sports Games;

g.     Whether EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in EA Sports Games deprived Class Members of the benefit of their bargain in purchasing the games;

h.     Whether EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in EA Sports Games Ultimate Team Modes deprived Class Members of the benefit of their bargain in purchasing Player Packs or Player Cards;

14

i.      Whether EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms in FIFA Ultimate Team Mode manipulated Class Members into purchasing Player Packs or Player Cards they would not otherwise have purchased;

j.      The proper amount of restitution or disgorgement;

k.      The proper equitable and injunctive relief; and

l.      The proper amount of reasonable litigation expenses and attorneys' fees.

63.    Plaintiffs' claims are typical of Class Members' claims in that they are based on the same underlying facts, events, and circumstances relating to EA's conduct. Fed. R. Civ. P. 23(a)(3).

64.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

65.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

66.    Questions of law and fact common to the Class predominate over any questions affecting only individual class members.

67.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

### **VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §§ 1750 *ET SEQ.***

68.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

69. The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

70. EA's policies, acts, and practices were designed to, and did, result in the Class Members' purchase and use of the EA Sports Games and in-game Player Packs and Player Cards, and violated and continue to violate the following sections of the CLRA:

a.   § 1770(a)(5): representing (including through omission) that goods have characteristics, uses, or benefits which they do not have;

b.   § 1770(a)(7): representing (including through omission) that goods are of a particular standard, quality, or grade if they are of another;

c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

71. In compliance with Cal. Civ. Code § 1782, Plaintiffs sent written notice to EA of their claims under the CLRA. For EA's violation of the CLRA, Plaintiffs presently seek restitution and injunctive relief, but do not presently seek compensatory and punitive damages. If EA fails, after 30 days, to satisfy their demands and rectify its behavior, Plaintiffs will amend this Complaint to seek damages under the CLRA.

72. Because these claims are subject to a three-year statute of limitations, while Plaintiffs' claims for restitution under the UCL are subject to a four-year statute of limitations, and because Plaintiffs' claims under the UCL's "unfair" and "unlawful" prongs are subject to different elements and standards, *see Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019), Plaintiffs' legal remedies under the CLRA are inadequate to fully compensate Plaintiffs for all of EA's challenged behavior.

73. In compliance with Cal. Civ. Code § 1782(d), affidavits of venue are filed concurrently with the Complaint.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW,**

**CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.***

74.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

75.     The FAL prohibits any statement in connection with the sale of goods "which is untrue or misleading," Cal. Bus. & Prof. Code § 17500, including deceptive omissions of material information.

76.     As set forth herein, by virtue of EA's use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms, its representations of player ratings as set forth on Player Cards obtained from Player Packs or in-game open markets are false and misleading.

77.     As set forth herein, EA was and is under an obligation to disclose its use of DDA, Adaptive Difficulty, and any other Difficulty Adjusting Mechanisms, but deceptively failed to do so.

78.     In violation of the FAL, EA knew, or reasonably should have known, that both its failure to disclose its use of DDA, Adaptive Difficulty, or any other Difficulty Adjusting Mechanisms for the EA Sports Games, and its representations of player ratings in Ultimate Team Modes, were and are untrue and misleading.

79.     Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to Plaintiffs and Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

### CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*

80.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

81.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200.

### Fraudulent

82.     In marketing the EA Sports Games and its in-game Player Packs, EA regularly and intentionally omits material information regarding its use of DDA, Adaptive Difficulty, or other Difficulty Adjusting Mechanisms for the EA Sports Games. Moreover, EA has actively concealed this material information, including by falsely denying in public statements that it uses DDA or other Difficulty Adjusting Mechanisms.

83.     In marketing in-game Player Packs and Player Cards for the EA Sports Games, EA misrepresents players' ratings.

### Unfair

84.     EA's conduct in using DDA, Adaptive Difficulty, or other Difficulty Adjusting Mechanisms for the EA Sports Games is unfair because EA's conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

85.     EA's conduct in using DDA, Adaptive Difficulty, or other Difficulty Adjusting Mechanisms for the EA Sports Games is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including the False Advertising Law and Consumers Legal Remedies Act.

86.     EA's conduct in using DDA, Adaptive Difficulty, or other Difficulty Adjusting Mechanisms for the EA Sports Games and the Ultimate Team Modes is also unfair because the consumer injury is substantial, is not outweighed by benefits to consumers or competition, and is not one consumers themselves could reasonably have avoided.

87.     Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims CLRA, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of EA's challenged behavior.

**Unlawful**

88.     The acts alleged herein are "unlawful" under the UCL in that they violate at least the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, and the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*

89.     Because Plaintiffs' claims under the "unlawful" prong of the UCL sweep more broadly and are subject to a different standard than their claims under the CLRA, Plaintiffs' legal remedies are inadequate to fully compensate plaintiffs for all of EA's challenged behavior.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT

90.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

91.     As a result of EA's undisclosed use of DDA, Adaptive Difficulty, or other Difficulty Adjusting Mechanisms for the EA Sports Games, EA has been unjustly enriched at the expense of Plaintiffs and other Class Members, who purchased the EA Sports Games, in-game Player Packs, and in-game Player Cards when they otherwise might not have, or spent more to purchase the EA Sports Games, Player Packs, and Player Cards than they otherwise would have absent EA's wrongful acts described herein.

92.     It would be inequitable for EA to retain the profits, benefits, and other compensation obtained from its wrongful conduct.

93.     As a result, Plaintiffs seek, on behalf of themselves and other Class Members, restitution from EA and an Order disgorging all of EA's inequitably-obtained revenue, profits, benefits, or other compensation.

94.     Because the Court has broad discretion to find EA was unjustly enriched even if its conduct does not comprise a violation of the CLRA, because the Court has broad discretion

to award appropriate relief, and because EA may have been unjustly enriched in an amount different than the amount Plaintiffs and Class Members were damaged, Plaintiffs' legal remedies are inadequate to fully compensate plaintiffs for all of EA's challenged behavior.

## PRAYER FOR RELIEF

95.     Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against EA as to each and every cause of action, and the following remedies:

a.      An Order certifying this as a class action, appointing Plaintiffs and their counsel to represent the Class, and requiring EA to pay the costs of class notice;

b.      An Order enjoining EA from misrepresenting the EA Sports Games, Player Packs, and Player Cards in the manners alleged herein;

c.      An Order compelling EA to conduct a corrective advertising campaign to inform the public that EA Sports Games, Player Packs, and Player Cards were deceptively marketed and sold;

d.      An Order requiring EA to pay restitution to restore funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, a violation of the UCL, FAL, or CLRA;

e.      An Order requiring EA to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice, including any unjust enrichment;

f.      Pre- and post-judgment interest;

g.      Costs, expenses, and reasonable attorneys' fees; and

h.      Any other and further relief the Court deems necessary, just, or proper.

## JURY DEMAND

96.     Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 16, 2020          /s/ Jack Fitzgerald

**THE LAW OFFICE OF
JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 4th Ave., Ste. 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 353-0404

**THE  LAW  OFFICE  OF
PAUL K. JOSEPH, PC**
PAUL K. JOSEPH
*paul@pauljosephlaw.com*
3150 Cabrillo Bay Ln.
San Diego, California 92110
Phone: (619) 767-0356
Fax: (619) 331-2943

***Counsel for Plaintiffs***

*Zajonc et al. v. Electronic Arts Inc.*
CLASS ACTION COMPLAINT